J-E01004-21
J-E01005-21

2021 PA Super 189

| IN THE INTEREST OF: C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | No. 121 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001613-2019

\*\*\*\*\*

| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | No. 127 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001614-2019

\*\*\*\*\*

| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | No. 129 EDA 2020 |

J-E01004-21
J-E01005-21

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001615-2019

*****

| | | |
|---|---|---|
| IN THE INTEREST OF: C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 124 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001613-2019

*****

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 125 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001614-2019

*****

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |

- 2 -

J-E01004-21
J-E01005-21

| | : | |
| | : | |
| | : | |
| | : | No. 128 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001615-2019

\*\*\*\*\*

| IN THE INTEREST OF: Y.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 130 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001612-2019


BEFORE: PANELLA, P.J., BENDER, P.J.E., LAZARUS, J., STABILE, J.,
NICHOLS, J., MURRAY, J., McLAUGHLIN, J., KING, J., and
McCAFFERY, J.

OPINION BY LAZARUS, J.:                    Filed: September 23, 2021

A.B. (Father) appeals from the trial court's orders adjudicating his three minor children, C.B. (born 1/16), and twins, K.B. and A.B. (born 5/19), dependent. S.B. (Mother) also appeals from the same orders adjudicating those minor children dependent, as well as an order adjudicating her other

- 3 -

child, Y.C.[1] (born 9/10), dependent.[2]  The court also entered an order finding that K.B. suffered child abuse.  Here, medical testimony established that five-month-old K.B. suffered injuries that were the result of non-accidental trauma that occurred while Father and Mother (collectively, Parents) were responsible for K.B.'s welfare.  Moreover, neither Father nor Mother could provide an explanation of how the injuries occurred.  Under these facts, the court applied the evidentiary presumption found at 23 Pa.C.S.A. § 6381(d), which establishes a *prima facie* case of abuse by the persons who were responsible for the child when the abuse occurred.  Because Mother and Father failed to rebut that presumption, we are constrained to affirm the orders.[3]

Mother and Father are the biological parents of C.B., K.B. and A.B.  Mother also has a child, Y.C., whose biological father passed away.  Father and Y.C. have a close, father-son type relationship.  Since Parents both work

_____

[1] We will refer to all four children, collectively, as "Children."

[2] We have *sua sponte* consolidated Father's and Mother's appeals, as the orders appealed and questions involved are the same.  **See** Pa.R.A.P. 513 (consolidation of multiple appeals).

[3] On September 2, 2020, a panel of this Court affirmed the trial court's findings of abuse with regard to K.B. and the adjudications of dependency and dispositions with regard to Children.  ***In the Interest of C.B., K.B., A.B., & Y.C.***, 121, 124-25, 127-30 EDA 2020 (Pa. Super. filed 9/1/20) (unpublished memorandum decision).  That decision was later withdrawn when the Court granted Mother's and Father's application for reargument on October 9, 2020.

outside the home, they hired two babysitters (Babysitter #1 & Babysitter #2)[4] to take care of Children when they are at work. Y.C.'s paternal grandmother (Paternal Grandmother)[5] also helps care for Children.

K.B. and A.B. attended the Goddard School in October 2019. On the evening of October 11, 2019, Parents had dinner at the Palm Restaurant in Philadelphia, while K.B. and A.B. were cared for by Babysitter #1. When Parents returned home from dinner at approximately 11:30 p.m., Children were asleep. The next morning, a Saturday, Parents left the house early to go shopping for winter coats in Delaware for Children; Children stayed with Babysitter #1 and Babysitter #2 while they were gone. Parents returned home from shopping around 5:30 p.m., at which time Babysitter #1 went to her home for a brief period. She returned to Parents' home around 8:00 p.m., resumed her babysitting duties, and stayed the night.[6] The following day, Sunday, October 13, Parents went to New York for the day. Y.C. and C.B. went to a pumpkin patch with Babysitter #2, while Babysitter #1 watched the twins at home. Mother testified that she received a picture of the twins in their car seats from Babysitter #1 at 4:30 p.m. on October 13, 2019, and that

---

[4] Babysitter #1 took care of the twins, K.B. and A.B., while Babysitter #2 took care of Y.C. and C.B.

[5] Paternal Grandmother is only the grandmother to Y.C., not to any of the other Children.

[6] Mother testified that Babysitter #1 stays overnight on Fridays and Saturdays to help with the twins.

there did not appear to be anything wrong with K.B. at that time. Neither babysitter noticed anything amiss with Children that day, except that K.B. fell asleep on his right side, which was unusual as he always slept on his back. Babysitter #2 testified that, when K.B. woke up that evening before Parents returned home from New York, his cry was not normal and sounded like "a grunt cry, almost as if he w[ere] hurt." N.T. Dependency/Abuse Hearing, 12/16/19, at 146-48. Paternal Grandmother,[7] Babysitter #1, and Babysitter #2 were at the house when Parents returned home from New York around 10:10 p.m. Babysitter #1 left to go home about 10 minutes later. Although K.B. was fussy that evening, it did not concern Mother or Father, since he was the more difficult of the twins.

---

[7] Paternal Grandmother stays overnight on Sundays and sleeps on the same floor of the home as the twins and, according to a social worker, is their direct caregiver. N.T. Dependency/Abuse Hearing, 12/1619, at 121.

Father testified at the abuse hearing that early on the morning[8] of October 14, 2019, K.B. let out a loud "scream" that woke up Parents.[9] *Id.* at 72. Father found K.B. in distress; Mother noticed that when K.B.'s right hand was touched, he would scream. Paternal Grandmother noticed that K.B. had swelling on his right arm and hand on the morning of the 14th as well. That morning, around 8:00 a.m., Parents took K.B. to Virtua Hospital (Virtua) in Voorhees, New Jersey, to be evaluated. Virtua is approximately a one-hour drive from Parents' home. A series of radiographs known as a "skeletal survey" showed that K.B. had a broken bone in his upper right arm and a right shoulder fracture; because there were no signs of healing, an examining doctor determined that the injuries had been sustained no earlier than seven

---

[8] Parents' testimony was inconsistent with regard to when and how Father discovered K.B. was injured. *See* N.T. Dependency/Abuse Hearing, 12/16/19, at 93-95 (DHS social worker, Krista Gilmore, testifying parents were inconsistent in explaining to her how they discovered K.B.'s injury). According to Ms. Gilmore, Father told her that Paternal Grandmother notified him of K.B.'s injury. *Id.* at 94; *see also* DHS Report, 11/18/19, at 3. However, at the dependency/abuse hearing, Father testified he learned about K.B.'s injury between 6:30 and 7:00 a.m. on Monday morning when K.B.'s scream woke him up; he then went back to the bedroom to tell Mother about K.B.'s distress. N.T. Dependency/Abuse Hearing, 12/16/19, at 72-73, 75. *Cf.* DHS Report, 10/14/19, at 3 ("Father . . . shared that [at] approximately 7 a.m. [h]e heard [Paternal Grandmother] call **them** because something was wrong with [K.B.'s] arm. **They** ran to the room and noticed the swelling to the arm.") (emphasis added).

[9] Notably, in the DHS report, Mother did not tell Ms. Gilmore that she was awoken by K.B.'s screams, in seeming contrast to Father's testimony at the abuse hearing. *See* N.T. Dependency Hearing, 12/16/19, at 72 ("[Mother] woke up out of her sleep as well, and she heard the scream and she said, 'No, that's not [C.B.]. That's [K.B.].'").

to ten days prior to the imaging. Mother and Father indicated that they had no idea how K.B sustained these injuries. In the twenty-four hours preceding the discovery of the injuries, K.B. had been in the care of three individuals in addition to Mother and Father: Paternal Grandmother, Babysitter #1, and Babysitter #2.

K.B. was transferred from Virtua to the emergency department of the Children's Hospital of Philadelphia (CHOP). At CHOP, Dr. Brian William Brennan, M.D., a child abuse expert and maltreatment fellow, evaluated K.B. for suspected child abuse. Doctor Brennan also interviewed Mother at CHOP regarding K.B.'s family medical history, the last time that K.B. seemed well, when K.B. last used his arm normally, and when Mother first noticed that K.B. was not using his injured arm normally. *Id.* at 13, 15-16. Doctor Brennan testified that Mother was not aware of K.B. suffering any kind of traumatic episode to precipitate the injuries, *id.* at 20-21, and that Mother admitted she and Father were K.B.'s primary caregivers. *Id.* at 26. Doctor Brennan also testified that after evaluating K.B., he concluded that K.B. had no skeletal abnormalities and discovered nothing in K.B.'s medical history or lab work that would lead him to believe that K.B.'s bones were more susceptible to breaking or that he suffered from any kind of nutritional deficiency or metabolic disorder. *See* N.T. Dependency/Abuse Hearing, 11/8/19, at 13-14, 28. According to the additional imaging done at CHOP, Dr. Brennan was able to discern, to a reasonable degree of medical certainty, that there were no signs of healing in either of K.B.'s two fractures, which suggested that the fractures

were fresh and had occurred within 7-10 days prior[10] to the imaging. *Id.* at 14. CHOP doctors determined that the injuries were caused by some sort of non-accidental trauma, and that the fractures were highly indicative of an abusive or inflicted type of injury. *Id.* at 24. In his expert opinion, Dr. Brennan testified that, to a reasonable degree of medical certainty, K.B. was a victim of child abuse. *Id.* at 27.

On October 14, 2019, the Philadelphia Department of Human Services (DHS) received a Child Protective Services (CPS) report (Report) alleging that five-month-old K.B. had arrived at CHOP with unexplained injuries of a broken upper right arm and fractures to his right shoulder. Social workers from DHS spoke to the family at CHOP. Mother and Father were both questioned by police about K.B.'s injuries; neither parent knew how K.B. sustained his injuries. Parents also did not report anything negative about K.B.'s caregivers to DHS or authorities. Mother, Father, Babysitter #1, Babysitter #2, and Paternal Grandmother were initially listed as potential perpetrators of abuse on the Report. DHS social worker Krista Gilmore, who investigated the abuse allegations, determined that K.B. was likely injured between late Sunday evening on the 13th and Monday morning on the 14th "[b]ased on the interviews,[11] based on the medical evidence, and based on the fact that

---

[10] K.B.'s Goddard School records revealed that he was asymptomatic on Friday, October 11th. *Id.*, 12/16/19, at 12.

[11] Gilmore testified that she interviewed Mother, Father, Babysitter #1, Babysitter #2, and Paternal Grandmother.

everyone said that [K.B.] was fine until Monday morning." *Id.*, 12/16/19, at 86-87. In Ms. Gilmore's DHS report, she noted that Paternal Grandmother "notified [Father] around 7 AM on Monday morning that [K.B.]'s right arm was red and swollen. [Father] reported that he then notified [Mother] and they decided to take [K.B.] to the E[mergency] R[oom]." DHS Report, 11/18/19, at 3. Furthermore, Mother told Gilmore that "[Father] came to her Monday morning about [K.B.'s] arm [and that she then] got dressed, got [A.B.] dressed[,] and went to see [K.B.'s] arm. [Then, she and Father] agreed that she would take [K.B.] to Virtua Hospital while [Father] dropped the rest of the children off [at] school/daycare." *Id.*

Although Gilmore concluded that Father and Mother are well bonded with Children and are capable of meeting their needs and keeping them safe,[12] she ultimately determined that the report was indicated with regard to Mother, Father, and Paternal Grandmother as to K.B.'s injuries. Specifically, Gilmore identified these three individuals as indicated perpetrators of abuse because

_____

[12] In fact, there is no evidence of record that K.B. had sustained any prior fractures or healed injuries that would suggest he had been abused in the past. *See* N.T. Dependency/Abuse Hearing, 12/16/19, at 180 (court noting K.B. had "no history of medical issues that would cause [him] to have these substantial injuries"). *Cf. In re A.H.*, 763 A.2d 873 (Pa. Super. 2000) (child's treating doctor found healed fracture of child's left radius, which was inflicted approximately one to two months prior to current abuse examination, and fracture of upper humerus of left arm, which was inflicted within two to four weeks prior to exam).

"[she] could not place them outside of the location at the time frame . . . that [DHS] had." *Id.* at 80, 120.

Children were taken into protective custody on October 16, 2019. A shelter care hearing took place on October 17, 2019, after which Children were ordered to remain in DHS's custody. At the time of the hearing, Y.C., C.B. and A.B. had been placed in kinship care with Father's mother, where the court permitted Parents to have supervised visits. When K.B. was released from CHOP, he also was placed in Father's mother's care.

DHS filed dependency petitions on October 21, 2019, alleging Children were "dependent and/or abused pursuant to the Juvenile Act[,] 42 Pa.C.S. § 6302 (Dependent Child [who is without proper care or control]) and/or the Child Protective Services Law [(CPSL),] 23 Pa.C.S. § 6303(b[.]1) [(defining "Child abuse")]. On November 6, 2019, the Child Advocate[13] filed a motion for a finding of child abuse as to Mother and Father with regard to K.B. *See* 23 Pa.C.S. § 6303(b.1). On November 8, 2019 and December 16, 2019, the court held a consolidated, two-day hearing on the dependency petitions and motion for finding of child abuse. At the hearings, Dr. Brennan, Ms. Gilmore, Babysitter #2, Mother, and Father testified.

---

[13] On October 16, 2019, the court appointed counsel and a guardian *ad litem* for K.B. At the dependency/abuse hearings, child advocate, Sarah Henschke, Esquire, and her supervising attorney and co-counsel, Beth Kahn, Esquire, represented Children.

The court found that the testimony narrowed down the timeframe of when K.B. sustained his injuries to between Sunday evening (October 13th) to Monday morning (October 14th). N.T. Dependency/Abuse Hearing, 12/16/19, at 181. Notably, the court pointed out that when Babysitter #2 returned home with the other children around 7:30 p.m. on the 13th, she observed K.B. sleeping on his right side, and "if he's sleeping on his right side, he could not have been hurt at that time[.]" *Id.* Mother also testified that when she and Father returned home from New York at 10 p.m. on the 13th, K.B. "was turned on his right side in his Boppy[14]." *Id.* at 46.[15]

On December 16, 2019, the trial court entered four orders of adjudication and disposition for each child. In addition, the court found, by clear and convincing evidence, that K.B. "suffered injuries of such a nature that were reckless and would ordinarily not be sustained or exist by reason of the acts or omissions of the parent," and that Parents perpetrated the abuse. Trial Court Opinion, 3/5/20, at 12; N.T. Dependency/Abuse Hearing,

_____

[14] A "Boppy" is an ergonomic pillow used by a caregiver to support infants and babies while they are being nursed or bottle-fed. *See* https://www.boppy.com/products/boppy-classic-feeding-infant-support-pillow (last visited on 6/2/21).

[15] On October 24, 2019, the court held a permanency hearing, keeping Children's temporary commitment in place, maintaining supervised visits, and giving DHS ten days to devise a safety plan for Children and to ultimately move forward with an adjudicatory hearing. N.T. Permanency Hearing, 10/24/19, at 13-14.

12/16/19, at 179-86 (trial court finding "clear and convincing evidence that the parents recklessly committed child abuse"); *see also* 23 Pa.C.S. § 6303(b.1)(1) (defining child abuse). With regard to K.B. and A.B., the court also found that clear and convincing evidence existed to declare them dependent and, accordingly, removed them from Parents' home "based upon the findings of abuse, neglect[,] or dependency[,]. . . that it is in the best interest of [] Child[ren] to be removed from [Parents'] home, . . . that to allow [] Child[ren] to remain in the home would be contrary to [] Child[ren]'s welfare, and that [DHS] made [r]easonable [e]fforts to prevent or eliminate the need for removal of [] Child[ren] from the home." K.B. Order, 12/16/19, at 1-2; A.B. Order, 12/16/19, at 1-2; *see* 42 Pa.C.S. § 6341(c). K.B. and A.B. were ordered to remain in kinship care with Father's mother, legal custody of K.B. and A.B. was transferred to DHS, and Parents were given twice weekly, line-of-sight and line-of-hearing visits at Father's mother's home. The court also permitted visits to be "modified by agreement of the parties." K.B. Order, 12/16/19, at 2; A.B. Order, 12/16/19, at 2. The placement goal for both K.B. and A.B. remained "return to parent or guardian." *Id.* Finally, Parents were referred to "Family School" and were ordered to complete parenting capacity evaluations, maintain contact with the Community Umbrella Agency (CUA), and attend all of K.B.'s medical and dental appointments. *Id.*

With regard to C.B. and Y.C., the court found by clear and convincing evidence that they were "without proper care, or control, subsistence, [or]

- 13 -

education as required by law, or other care necessary for [their] physical, mental, or emotional health, or morals." C.B. Order, 12/16/19, at 1; Y.C. Order, 12/16/19, at 1. The court, however, determined that it would not be contrary to C.B.'s and Y.C.'s welfare to permit them to remain in the family home, where "[C]hild[ren are] safe in the current placement setting." *Id.* at 1-2. Accordingly, legal custody of C.B. and Y.C. remained with Parents.

Father filed three timely notices of appeal from the dependency orders and abuse order, as well as a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Mother filed four timely notices of appeal from the dependency orders and abuse order, as well as a court-ordered Rule 1925(b) statement.[16] On appeal, Parents present the following issues for our consideration:

    (1)    Whether the trial court erred as a matter of law and abused its discretion where it determined that [Parents] were[] perpetrator[s] of child abuse against K.B.

    (2)    Whether the trial court erred as a matter of law where it determined that [Children] met the definition of dependent children.

    (3)    Whether the trial court erred as a matter of law and abused its discretion when it ordered that it was clearly necessary to remove K.B. and A.B. from [P]arents' care.

_____

[16] On January 5, 2020, three days after they filed their notices of appeal, Mother and Father each filed motions for reconsideration of the court's dependency orders and abuse order. However, it appears that the court did not rule on the motions. *See Cheatem v. Temple Univ. Hosp.*, 743 A.2d 518, 520 (Pa. Super. 1999) (filing of motion for reconsideration does not toll thirty-day appeal period, unless trial court enters order expressly granting reconsideration within thirty days of entry of appealable order).

Substituted Brief for Parents (Redacted), at 3.

Father's and Mother's first issues allege that the trial court committed error when it determined that they were perpetrators of abuse with regard to K.B. Specifically, they contend that their conduct did not meet the legal standard for a perpetrator by omission, that there is no evidence of record to support the conclusion that their conduct was reckless, and that applying the presumption under section 6381(d) of the CPSL was in error. ***Id.*** at 18.

"[Although] dependency proceedings are governed by the Juvenile Act (Act),[17] . . . the CPSL[18] . . . controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." ***In re L.V.***, 209 A.3d 399, 417 (Pa. Super 2019) (citations omitted); ***see also In the Interest of X.P.***, 248 A.3d 1274, 1276 (Pa. Super. 2021) (same). The CPSL "does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child." ***In the Interest of J.R.W.***, 631 A.2d 1019, 1022 (Pa. Super. 1993). "[T]he Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the Law and the [CPSL] to determine how that finding [of child abuse] is interrelated." ***Id.*** at 1023.

---

[17] 42 Pa.C.S. §§ 6301-6475.

[18] 23 Pa.C.S. §§ 6301-6387.

"'As part of [a] dependency adjudication, a court may find a parent [or caregiver] to be the perpetrator of child abuse[]' as defined by the . . . CPSL." *In re S.L.*, 202 A.3d 723, 728 (Pa. Super. 2019) (citation and quotations omitted). Section 6381 of the CPSL, which governs evidence in court proceedings, states that "[i]n addition to the rules of evidence . . . relating to juvenile matters, the rules of evidence in this section **shall govern** in child abuse proceedings in court[.]" 23 Pa.C.S. § 6381(a) (emphasis added). Specifically, section 6381(d) "provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury . . . as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child." *J.R.W.*, *supra* at 1023; 23 Pa.C.S. § 6381(d).

In *In the Interest of N.B.-A.*, 224 A.3d 661 (Pa. 2020), the Pennsylvania Supreme Court recently reiterated the appropriate standard of proof for a finding of child abuse:

> The requisite standard of proof for a finding of child abuse pursuant to [s]ection 6303(b.1) of the CPSL is clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S. § 6341(c)[]. Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [] **However, in certain situations, the identity of the abuser need only be**

> **established through *prima facie*[19] evidence.** As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, th[is] [C]ourt is not bound by the lower court's inferences or conclusions of law.

*Id.* at 668 (citations omitted) (emphasis added).

"The purpose of the CPSL is to bring about quick and effective reporting of suspected child abuse so as to serve as a means for providing protective services competently and to prevent further abuse of the children while providing rehabilitative services for them and the parents." *J.R.W.*, *supra* at 1021, citing 23 Pa.C.S. § 6302(b). The CPSL "was created primarily for reporting suspected child abuse, providing the means for doing so[,] and establishing the persons responsible for reporting the abuse[.]" *Id. See also* 23 Pa.C.S. §§ 6311-6320.

Section 6381(d) of the CPSL, found under the subchapter titled "**Miscellaneous Provisions**," establishes a rebuttable, evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party. Under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of

---

[19] *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *In the Interest of L.Z.*, 111 A.3d 1164, 1184 (Pa. 2015), citing Black's Law Dictionary 825 (6th ed. abridged 1991).

abuse by the parent or person responsible." ***In the Interest of L.Z.***, 111 A.3d 1164, 1167 (Pa. 2015).[20]

To aid the Juvenile Court in determining whether a child has been abused, "the Legislature deemed it wise and necessary to establish a different evidentiary standard for finding child abuse by a parent or person responsible for the child's care, one in contrast to the overall standard for determining dependency under the Act." ***Id.*** The ***J.R.W.*** Court recognized:

> **This lessened standard of establishing abuse by the caretakers** [under section 6381(d)]**, coupled with the clear and convincing evidence necessary to find dependency, has been imposed by the Legislature as the standard which the Juvenile Court must apply in deciding abuse cases.** *Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case. There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse. **The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required.** We find no defect in this reasoning. Such a standard provides maximum protection for the

---

[20] Section 6381(d) provides:

> **(d) *Prima facie evidence of abuse.*** — Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d).

child victim or other children in the community who might be subject to similar abuse if the alleged abuser was not identified and permitted free access to the victim or other vulnerable children.  It is not equivalent to a finding of guilt in a criminal proceeding which could result in deprivation of freedom.  Thus[,] the [L]egislature has balanced the needs of society and children for protection against the abuser's possible patterned behavior and his/her right to freedom unless found guilty beyond a reasonable doubt.[21]

---

[21] Once the Juvenile Court has made a determination that child abuse has occurred, by clear and convincing evidence, a "founded report" may be lodged with the Department of Public Welfare [DPW] determining that the parents are the persons responsible for the abuse." **J.R.W.**, **supra** at 1025.  Under the CPSL, "[t]he perpetrator of the abuse is notified of the report and his/her right, within 45 days, to seek expungement of the report[.]"  **G.V. v. Dep't of Pub. Welfare**, 52A.3d 434, 447-47 (Pa. Commw. 2012), citing 23 Pa.C.S. §§ 6338(a), 6341(a); 55 Pa. Code §§ 3490.40, 3490.45, 3490.105a(a). Specifically, under section 6341(a)(1), "[a]t any time, the secretary may amend or expunge any record in the Statewide database . . . **upon good cause shown** and notice[.]"  23 Pa. C.S. § 6341(a)(1) (emphasis added). "Good cause shall include, but is not limited to, the following:  (i) Newly[-]discovered evidence that an indicated report . . . is inaccurate or is being maintained in a manner inconsistent with this chapter[;] or (ii) **A determination that the perpetrator in an indicated report of abuse no longer represents a risk of child abuse and that no significant public purpose would be served by the continued listing of the person as a perpetrator in the Statewide database**."  **Id.** at § 6341(a)(1)(i), (ii) (emphasis added).  In cases where a report is not expunged and the adult perpetrator's Social Security number and date of birth are not known, the indicated reports must be expunged when the child is 23 years of age.  23 Pa.C.S. § 6338(b); 55 Pa.Code § 3490.39(a).  If the adult perpetrator's Social Security number and date of birth are known, certain information on the perpetrator is indefinitely maintained in a sub-file in the ChildLine Registry. **G.V.**, **supra**, at 447.  Finally, "[a]fter a hearing and a determination that a claim of abuse has a substantial basis, the [DPW] shares the information only with persons and agencies performing investigative and child protective functions, a child's examining or treating physician, a guardian *ad litem*, a court, federal auditors, and a prospective adoptive parent."  **See R. v. Dep't of Pub. Welfare**, 636 A.2d 142, 151 (Pa. 1994); **see also** 23 Pa.C.S. § 6340 (Release of information in confidential reports).

*Id.* at 1024 (emphasis added). *See L.Z.*, 111 A.3d at 1184 ("The Legislature, however, carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent[.]").

Under section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by . . . [DHS] . . . and the rebuttal of the parent or responsible person.

*L.Z.*, 111 A.3d at 1185. *See id.* at 1176 n.15 (section 6381(d) presumption may be rebutted with evidence that parent or responsible person was absent at time of injury and not otherwise responsible for injury by failing to secure proper care for child). A parent does not actually have to be physically present with the child at the time of the abuse for the presumption to apply to that parent. *Id.* at 1185-86.

Instantly, the trial court deemed Father and Mother perpetrators of child abuse, concluding that "the record established *prima facie* evidence that [Parents were two] of the perpetrators of child abuse as to [K.B.] under 23 Pa.C.S.[] § 6381(d), since [Parents were two] of the three primary caregivers

for [K.B.] during the period when [K.B.] could have been injured." Trial Court Opinion, 3/3/20, at 12. Thus, the court applied the rebuttable presumption under section 6381(d).

With regard to the trial court's culpability finding that the abuse had been inflicted "recklessly," we recognize that this determination was superfluous.[22] *See* 23 Pa.C.S. § 6303(b.1) (defining term "child abuse" under CPSL as "intentionally, knowingly or recklessly doing" one of many acts delineated under subsection). Under section 6381 of the CPSL, a petitioning party is not required to establish that the parent or caregiver perpetrated the abuse "intentionally, knowingly or recklessly."[23] Rather, in section 6381 cases, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible," permitting petitioners to "prove their case **with only the physical evidence of injuries that would not**

---

[22] *See* N.T. Dependency/Abuse Hearing, 12/16/19, at 179-86.

[23] Likewise, a petitioning party need not prove separately that such abuse "[c]aus[ed] bodily injury to a child through any . . . failure to act," 23 Pa.C.S. § 6303(b.1)(1), otherwise known as perpetrator by omission. Under section 6381(d), *prima facie* evidence of abuse is established, and we presume the actors are the perpetrators of that abuse, unless rebutted. Here, the trial court did not make a finding that Mother and Father were perpetrators by omission under section 6303(b.1)(1). Rather, when the court mentioned the term, it was merely referring to the fact that the section 6381(d) presumption applies when a child has suffered abuse "of such a nature as would" not normally occur "**except by reason of the omissions of the parent or other [responsible person]**." *Id.* (emphasis added). *See also L.Z.*, 111 A.3d at 1184 (inclusion of word "omissions" in section 6381(d), encompasses situations where parent or responsible person is not present at time of injury but is, nonetheless, responsible due to his or her failure to provide protection for child).

**ordinarily be sustained but for the action [or inaction] of the parents or responsible persons** and the **implausible statements** of the parents and responsible persons." *L.Z.*, *supra* at 1167, 1185 (emphasis added). *See J.R.W.*, *supra* at 1024 ("[The] likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence that the custodian has caused the injury, **either by acts or omissions**, is all that is required" under section 6381(d)) (emphasis added). *See also S.L.*, *supra* at 728 ("In situations where a perpetrator of abuse is unknown, a parent's culpability may be established by *prima facie* evidence pursuant to [section] 6381(d)."); *J.R.W.*, *supra* at 1023 (explaining section 6381(d)'s reduced evidentiary standard of *prima facie* evidence establishing abuse by caretakers "coupled with the clear and convincing evidence necessary to find dependency," is standard "[j]uvenile [c]ourt must apply in deciding abuse cases").

In *N.B.-A.*, *supra*, the Supreme Court reversed our en banc Court's holding, which had applied the section 6381(d) presumption and found that a mother had committed child abuse by omission. There, a mother took her six-year-old daughter to the emergency department at CHOP, reporting that child had been experiencing vaginal discharge for three days. Mother indicated she had no concerns that child may have been sexually abused. Mother told CHOP staff that she and child lived with child's maternal grandmother and that no males lived with them. After a physical examination, child was discharged from CHOP, with instructions to take baths and maintain

good hygiene. The results of lab tests later revealed that child was suffering from a sexually-transmitted disease; mother was asked to return to CHOP with child for additional testing. Mother consistently denied that any males lived in the home with her and child; however, child told CPS caseworkers that three males lived with them, a stepfather and two of mother's stepsons. Mother and one stepson later tested positive for the same sexually-transmitted disease that child had. DHS obtained an order for protective custody and child was adjudicated depended and placed in foster care. One month later, stepbrother was identified as the perpetrator of sexual abuse against child.

The trial judge, the Honorable Lyris F. Younge, did not find mother credible and ultimately entered an order finding that she was a perpetrator of sexual abuse under section 6303(b.1), concluded that aggravated circumstances existed pursuant to section 6302(2), and found that DHS was not required to continue to make reasonable efforts at reunification. *Id.* at 665-66. On appeal, our Court reversed the finding of aggravated circumstances, but affirmed the juvenile court's finding that mother was a perpetrator of child abuse under sections 6303(b.1) and 6381(d) of the CPSL. In reaching its decision to reverse this Court, the Supreme Court concluded that:

> [T]he Superior Court . . . err[ed] in applying the [s]ection 6381(d) presumption . . . [where] there was no evidence presented in th[e] case that [m]other perpetrated the abuse . . . [and] there was no evidence presented that [m]other knew or should have known that [c]hild was being abused, sexually or otherwise, as [the

- 23 -

examining doctor] testified that [c]hild did not present any physical signs of injury or abuse when she initially examined her, and such testimony was consistent with the medical records from CHOP, which indicated that [c]hild did not have any signs of physical injury or abuse, aside from the vaginal discharge reported by [m]other.

\* \* \*

Accordingly, we hold that the [s]ection 6381(d) presumption is not applicable where there is no evidence that the parent or other person responsible for the welfare of the child knew or should have known of the abuse or risk of abuse and disregarded it. **As DHS failed to offer any evidence that [c]hild's abuse was of such a nature as would ordinarily not be sustained or exist except by reason of the acts of omissions of the parent or other person responsible for the welfare of the child, the Superior Court erred in applying the [s]ection 6381(d) presumption**.

*Id.* at 674, 675 (emphasis added).  Moreover, there was no evidence that child ever reported being sexually abused; in fact, child continually denied that she had been sexually abused.  Finally, because DHS presented no evidence that mother knew or should have known that stepson posed a risk to child, but ignored that risk, the Court concluded "we cannot find that the abuse in this case was of a type that would ordinarily not occur except for the acts or omissions of the child's caretaker." *Id.* at 675.

The instant case is distinguishable from the facts of *N.B.-A.*  Unlike the child in *N.B.-A.*, here, K.B. was an infant when the abuse occurred, and, thus, incapable of describing or denying that abuse.  The most notable distinction, however, is Dr. Brennan's determination that K.B.'s fractures were non-accidental and "most likely the result of inflicted trauma."  N.T. Dependency/Abuse Hearing, 11/8/19, at 24.  In his expert medical opinion,

K.B.'s injuries were inflicted intentionally and caused by force being applied to his arm in a "yanking-type" motion—injuries that would have caused him substantial or severe pain. *Id.*, at 22, 31-32. Under such circumstances, the trial court found that abuse had been proven by clear and convincing evidence.

In *L.Z.*, *supra*, the Pennsylvania Supreme Court provided additional guidance on applying the section 6381(d) presumption — specifically, in cases that involve multiple caregivers responsible for the care and protection of an abused child and when the evidence fails to demonstrate definitively which individual inflicted the abuse. In *L.Z.*, the Court reviewed whether our Court erred in not applying the presumption in such cases "where the record fails to establish that the child was in the parent's care at the time of the injury." *Id.* at 1176 (citation omitted). The child in *L.Z.*, who was 21 months old, was brought to the hospital by his mother and maternal aunt[24] to be treated for a deep cut that extended nearly halfway around the base of his penis. Hospital doctors also observed a dark bruise around the buckle area (above the jawbone and below the cheekbone) on both of child's cheeks. The bruises were somewhere between a day and a week old at the time child arrived at the hospital. Child also suffered from severe diaper rash and a yeast infection.

Child's injuries were determined to be consistent with abuse and inconsistent with several explanations given by mother and aunt. Aunt

_____

[24] Maternal aunt and mother lived together and were both child's primary caregivers.

claimed that child caused his own injuries by tugging on his penis during a diaper change. Mother, who acknowledged at the hospital that she and aunt were child's primary caretakers, claimed that she had been visiting a paramour for the two days prior to the hospital visit and had not seen child since that time. Concluding that the child's injuries were non-accidental, hospital staff filed a report with DHS. A report was also prepared by CPS; aunt was indicated as a perpetrator of abuse in the CPS report.[25] Child was placed in protective custody. DHS filed dependency and aggravated circumstances petitions.

At an adjudicatory hearing, a doctor testified that child's cheek bruises were "common abuse injur[ies;]" a medical director of the hospital's pediatric inpatient unit, who also examined child, opined that child was abused. *Id.* at 1167. Following the hearing, the trial court entered an order adjudicating child dependent, found it was in his best interest to be removed from mother's home, and, significantly, found that child was a victim of abuse and that mother was the perpetrator of such abuse. Finally, the court concluded that aggravating circumstances existed and, therefore, that DHS did not need to make further efforts to reunify child with mother.

In her Rule 1925(a) opinion, the trial judge stated that she found clear and convincing evidence establishing that child was without parental care and that child's injuries would not have occurred "but for [m]other's omissions as

---

[25] A general protective services report was substantiated against mother for lack of supervision and for child suffering from a yeast infection.

his primary caretaker." *Id.* at 1169. On appeal, mother claimed that the court erred in finding that she was responsible for child abuse; our Court affirmed the dependency adjudication, but vacated the court's determination that mother was the perpetrator of the abuse. Our Court granted the guardian *ad litem*'s petition for reargument en banc and, consistent with our panel decision, affirmed the dependency adjudication and vacated the perpetrator of abuse determination. Notably, in reaffirming the panel's decision to vacate the finding that mother was the perpetrator of child's abuse, the en banc panel held that section 6381(d) does not permit a court to designate a parent as a perpetrator of abuse "where the record fails to establish that the child was in the parent's care at the time of the injury." *In re L.Z.*, 91 A.3d 208, 216 (Pa. Super. 2014), *rev'd*, 111 A.3d 1164 (Pa. 2015).

In reversing our Court, the Supreme Court came to the following conclusions regarding section 6381(d)'s rebuttable presumption: (1) there is no requirement that a parent be physically present at the time of the injury; and (2) the inclusion of the word "omissions" in section 6381(d), encompasses situations where the parent or responsible person is not present at the time of the injury but is, nonetheless, responsible due to his or her failure to provide protection for the child. *L.Z.*, 111 A.3d at 1184. In so holding, the Court recognized that abuse cases, like the present, often involve "multiple caregivers . . . that circle the wagons," and "children [that] may be too young . . . to describe the abuse," and, thus, "CYS agencies are left to prove [these] case[s] with only the physical evidence of injuries that would not ordinarily be

sustained but for the action of the parents or responsible persons and the implausible statements of the parents or responsible persons." *Id.* at 1185.

Here, the medical evidence presented by DHS demonstrated that, like child's injures in *L.Z.*, K.B.'s injuries were neither accidental nor self-inflicted and were of such a nature that they would not ordinarily be sustained except by reason of the acts or omissions of the parent or other person responsible for K.B.'s welfare. The trial court reasonably concluded, based upon testimony from caseworker Gilmore, that K.B.'s injuries occurred sometime after Babysitter #1, K.B.'s sitter, left for the evening on the 13th and when he awoke on the 14th. In addition, the trial judge concluded, based on the expert medical testimony, that, because K.B.'s injuries were so substantial and would have caused him considerable pain, K.B. had not yet sustained his injuries when he was sleeping on his side when Parents returned home at 10 p.m. on the 13th. *See In the Interest of R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (Court required to defer to trial court's credibility findings if they are supported by evidence of record). Accordingly, the record corroborates that K.B. was a victim of child abuse, by clear and convincing evidence, where expert medical evidence established K.B. suffered non-accidental trauma. Moreover, we concur with the trial court that the section 6381(d) *prima facie* presumption of abuse was established with regard to Mother and Father. *See In re S.L.*, 202 A.3d 723, 729-30 (Pa. Super. 2019) (section 6381(d) presumption properly applied to mother where: child suffered non-accidental injuries; mother among adults responsible for child when injuries occurred; and mother

denied knowing how child injured); *see also In re J.R.W.*, *supra* at 1023 (presumption protects those innocent victims of abuse who are "too young . . . to describe their abuse" and necessary in cases where "agencies [are left] . . . to prove their case with only physical evidence of injuries that would not ordinarily be sustained but for the action of the parents or responsible persons").

Moreover, Mother and Father failed to rebut the presumption by presenting evidence or testimony at the abuse hearing establishing that K.B. was not in their care when he suffered his injuries.[26] While Paternal Grandmother may have routinely stayed overnight on Sundays on the same floor as the twins, neither Mother nor Father presented evidence that they relinquished all control of their parental duties with regard to K.B. to Paternal Grandmother at the time Child sustained his non-accidental injuries. In fact, Dr. Brennan testified that Mother admitted that she and Father were K.B.'s primary caretakers. N.T. Dependency/Abuse Hearing, 11/8/19, at 26.[27]

The significant fact remains that Mother, Father, and Paternal Grandmother were all in the home and had equal access to K.B. at the time

---

[26] Parents did not note any concerns in medical records about their childcare providers to CHOP medical staff. **See** N.T. Dependency/Abuse Hearing, 11/8/19, at 27. **See also** 23 Pa.C.S. § 6381(d) (parent or responsible person may rebut presumption through testimony establishing that they gave responsibility for the child to another person about whom they had no reason to fear); **L.Z.**, 111 A.3d at 1185 (same).

[27] While a social worker may have classified Paternal Grandmother as a direct caregiver to K.B., **see supra**, at 6 n.7, there is no record evidence that Paternal Grandmother was K.B.'s sole caregiver at the time he was injured.

he was injured.[28]   In such cases, "[t]he evaluation of the validity of the presumption . . . rest[s] with the trial court evaluating the credibility of the *prima facie* evidence presented by the [] agency and the rebuttal of the parent or responsible person." ***L.Z.***, 111 A.3d at 1185 (emphasis added).   Simply put, we do not find that Parents' countervailing rebuttal evidence was "substantial" enough to rebut the presumption and, thus, reverse the trial court's determination.[29]   ***Id.*** at 1180 (section 6381(d) presumption "can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence") (emphasis added).   ***See also In re S.G.***, 922 A.2d 943, 947 (Pa. Super. 2007) (trial court, not appellate court, is charged with responsibilities of evaluating credibility of witnesses and resolving any conflicts in testimony; when trial court's findings are supported by competent

---

[28] Moreover, it is of little moment that Mother took Child immediately to the hospital after discovering his injuries.  Such post-injury evidence does not rebut the presumption.  ***See In the Interest of A.C.***, 237 A.3d 553 (Pa. Super. 2020) (Mother's actions **following** child's injury—such as seeking medical attention, staying at hospital with child, providing doctors with thorough history, and asking appropriate questions—did not rebut section 6381(d) presumption).

[29] The trial court's determination of Parents' credibility undoubtedly involved assessing their inconsistent testimony with regard to when and how they discovered K.B.'s injuries.  ***See L.Z.***, ***supra***; ***see also supra***, at 7 nn.8-9; ***In the Interest of A.C.***, ***supra*** at 563 (trial court did not abuse its discretion by giving weight to testimony of doctor and DHS social worker over that of Mother to find section 6381(d) presumption not rebutted and determining Mother was perpetrator of child's abuse).

evidence of record, we will affirm even if record could also support opposite result).

Under these circumstances, we conclude that the trial court properly found that Mother and Father were perpetrators of abuse under section 6381(d).[30] The presumption is the only means that a court has to ensure that an infant, like K.B., will remain safe when, under his Parents' care, he has been abused and the identity of the perpetrator cannot be established. In essence, it forces caregivers either to come forward with the identity of the perpetrator of abuse or be assigned fault where it was their responsibility to care for the child and keep the child safe. As emphasized by our Supreme Court in **L.Z.**, "when a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and

_____

[30] We believe the trial judge did an exemplary job in what was, no doubt, a very difficult case. The trial judge noted that his conclusion that the section 6381(d) presumption applied in the matter "doesn't mean that [K.B.'s] parents are bad parents either. It just means that somehow the child got hurt in such a way that nobody can explain [it]." N.T. Dependency/Abuse Hearing, 12/16/19, at 179. He applied the presumption appropriately, made sure that the family goal remained reunification, ordered that Mother and Father's older children remain in their care and custody, and ensured that Mother and Father would attend appropriate parenting classes and receive necessary evaluations, while permitting the twins to remain in kinship care with Father's mother, who supervised twice-weekly visits with Parents. In short, the judge made it very clear that he wanted this family to be able to get through this ordeal and reunite as a unit. **See** 23 Pa.C.S. § 6302(b) (one of many purposes of CPSL is to "stabilize and protect the integrity of family life where[]ever appropriate"); **see also In the Interest of A.C.**, **supra** at 566 (Court noted despite trial court finding Mother perpetrator of child abuse, it still maintained goal of reunification with parents).

protection of the child whether they actually inflicted the injury or failed in their duty to protect the child." *L.Z.*, 111 A.3d at 1185. *See id.* at 1184 (the plain language of section 6381(d) "neither mentions nor focuses upon the parent or responsible person's physical presence at the time of the injury[; t]he inclusion of 'omissions' encompasses situations where the parent or responsible person is not present at the time of the injury but is nonetheless responsible due to his or her failure to provide protection for the child").

Father's and Mother's next issues concern the trial court's adjudication of Children as dependent.[31] Specifically, they contend that because they are not responsible for K.B.'s injuries, the trial court's dependency determination is erroneous. Having already determined that Father and Mother were both properly found to be perpetrators of abuse to K.B., this issue is moot. *See In re R.P.*, 957 A.2d 1205, 1213 (Pa. Super. 2008) (stating where trial court finds one sibling dependent due to abuse, court may determine other siblings

---

[31] Our scope of review in child dependency cases "is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court." *In re Read*, 693 A.2d 607, 610 (Pa. Super. 1997). We accord great weight to the hearing judge's findings of fact because he is in the best position to observe and rule upon the credibility of the witnesses. *Id.* "Relying on this unique posture, we will not overrule the findings of the trial court if they are supported by competent evidence." *Id. See also In the Interest of X.P.*, *supra* at 1276 (well-settled standard of review in dependency cases "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law").

also dependent, even if they have not been abused).

Finally, Father and Mother argue that the trial court erred in determining that it was clearly necessary to remove K.B. and A.B. from their care where that determination "was made based on the abuse to K.B." and where "[n]either Mother nor Father are responsible for this injury." Father's Brief, at 19; Mother's Brief, at 19. Again, as we have affirmed the court's finding of abuse perpetrated by Father and Mother with regard to K.B., this issue is moot. *See In re R.P.*, *supra*.

Orders affirmed.

President Judge Panella, President Judge Emeritus Bender, Judge Stabile, Judge Nichols, Judge Murray and Judge King join this Opinion.

Judge McLaughlin files a Concurring Statement.

Judge McCaffery files a Dissenting Opinion.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/23/21